# United States Court of Appeals
## For the First Circuit

No. 23-1037

UNITED STATES OF AMERICA,

Appellee,

v.

DJUNA GONCALVES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Donna J. Brown, with whom Michael G. Eaton and Wadleigh, Starr & Peters, P.L.L.C., were on brief, for appellant.

Karen L. Eisenstadt, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

December 17, 2024

**GELPÍ**, **Circuit Judge**. Defendant-Appellant Djuna Goncalves ("Goncalves") was indicted for, and pleaded guilty to, eight counts of drug and firearm-related charges, reserving his right to appeal a sentence greater than 180 months' imprisonment. Goncalves was sentenced to 230 months' imprisonment followed by five years of supervised release. He timely appealed his sentence, arguing that the district court should not have applied a two-level enhancement for his role as an organizer, leader, supervisor, or manager pursuant to U.S.S.G. § 3B1.1(c). For the reasons to follow, we vacate the imposition of the enhancement and remand for resentencing without the same.

## I. Background

"Because this sentencing appeal follows a guilty plea, 'we glean the [following] relevant facts from the plea agreement, the undisputed sections of the presentence investigation report ["PSR"][], and the transcript[] of [the] change-of-plea and sentencing hearings.'" United States v. Spinks, 63 F.4th 95, 97 (1st Cir. 2023) (first, third, and fifth alterations in original) (quoting United States v. Ubiles-Rosario, 867 F.3d 277, 280 n.2 (1st Cir. 2017)).

### A. Offense Facts

Goncalves was initially indicted in Plymouth Superior Court shortly after local and state police officers apprehended his brother, Cody Goncalves ("Cody"), in February 2014 as he was

on his way to a drug transaction. Confidential informants informed investigators that Goncalves and Cody were participating in drug trafficking activities, leading to a search of their home which yielded controlled substances, paraphernalia, cash, and firearms. Goncalves and Cody were charged and released on bail. Subsequently, the investigators continued to receive information concerning Goncalves's distribution of controlled substances.

In 2018, agents from the Drug Enforcement Administration, Homeland Security Investigations, Massachusetts State Police, and Brockton Police Department began an investigation into the illicit activity of Goncalves and others in Brockton, Massachusetts.[1] The investigation included a wiretap of Goncalves's phone, controlled purchases, and extensive surveillance, resulting in the conclusion that Goncalves, Cody, Goncalves's other brother Tony Goncalves ("Tony"), Goncalves's cousin Carlos Antunes ("Antunes"), and multiple other associates were involved in the trafficking of controlled substances throughout southeastern Massachusetts.

For example, on October 12, 2018, agents intercepted a call where Antunes requested fentanyl from Goncalves for an upcoming drug transaction. Goncalves first told Antunes that he

---

[1] It is not entirely clear from the record what specific actions were taken by state, local, and federal officers and investigators throughout Goncalves's criminal history.

was picking him up and then further texted Antunes, who was then inside a Burger King waiting to consummate the deal, and requested him to ask the buyer when he would arrive because he was late. The drug transaction was later confirmed when the buyer was stopped by police officers.

In addition, Goncalves was in contact with a drug supplier coordinating receipt of drugs on his own behalf, and at least in one instance, on behalf of Cody. Goncalves also told a buyer that he would pick up Cody and bring him to a transaction involving the three of them. Law enforcement agents intercepted that phone call as well as observed the transaction, believing then that Goncalves and Cody worked together to deliver the drugs to the buyer. The agents also intercepted another call between Goncalves and a buyer where the latter requested that Goncalves obtain drugs from Tony so that he could purchase them. Surveillance further revealed that Goncalves would ask others for rides to drug transaction locations. Lastly, Goncalves was at the center of many violent incidents, including him being stabbed and someone attempting to assassinate him.

On October 21, 2018, police officers were alerted to gunshots near Goncalves's home. They conducted a safety and welfare check, and knocked and entered the home as gunshots had entered through the first floor wall and basement windows. Goncalves was found in the basement and, after the officers

- 4 -

discovered a firearm on the table, they took him into custody. After applying for a search warrant for the residence, police officers found firearms, ammunition, a cell phone, drugs, drug paraphernalia, and large quantities of cash.

## B. Procedural History

Following the 2018 investigation and search, a grand jury issued a 12-count indictment against Goncalves and others which was then superseded in 2019 and again in 2021 with the Government's filing of a Superseding Information. The Superseding Information charged Goncalves with eight counts.[2] Goncalves entered into a plea agreement with the Government in which he agreed to waive indictment on the charges and plead guilty to all eight counts.[3] In the plea agreement, Goncalves's guidelines base

---

[2] Count one: conspiracy to distribute and to possess with intent to distribute 100 grams or more of heroin, 400 grams or more of fentanyl, cocaine, cocaine base, oxycodone, and marijuana, in violation of 21 U.S.C. § 846; count two: possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(i); counts three and seven: felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1); counts four and eight: possession of a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i); count five: possession with intent to distribute fentanyl and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2; and count six: possession with intent to distribute 40 grams or more of fentanyl, cocaine, cocaine base, and marijuana and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi), and 18 U.S.C. § 2.

[3] The parties agreed on a 15-year mandatory minimum sentence consisting of ten years for the drug counts, followed by five years for the § 924(c) count. Count four was ultimately dismissed by the Government in order to establish the agreed upon mandatory minimum sentence as counts four and eight would have run

offense level amounted to 30 due to the quantity of drugs he was accountable for.[4]  The Government next submitted the following guideline calculations: a four-level increase because Goncalves was "a leader or organizer of a criminal activity that involved five or more people" under U.S.S.G. § 3B1.1, a two-level increase because Goncalves maintained the premises for the purpose of manufacturing or distributing controlled substances, and a three-level decrease because Goncalves accepted responsibility. With that, the Government recommended 308 months' imprisonment, which included the consecutive sentence for the firearm, followed by 120 months of supervised release.  Goncalves was not bound by the asserted guidelines range or sentence recommendation but agreed to waive appellate review except to challenge a sentence in excess of 180 months' imprisonment.

On October 7, 2021, the district court held a change-of-plea hearing where Goncalves did not dispute the underlying factual basis for his plea or guideline calculations with the exception that he was "not agreeing to . . . being . . . a leader for the organization."  The district

---

consecutively, which would have increased the mandatory minimum sentence to 20 years.

[4] The Government submitted and Goncalves does not dispute that he was accountable for at least 1,000 kilograms but less than 3,000 kilograms of converted drug weight under U.S.S.G. § 2D1.1(c)(5).

- 6 -

court determined that it was an issue for sentencing under the guidelines and proceeded to accept Goncalves's plea.

On March 17, 2022, the U.S. Probation Office disclosed the PSR and, following the parties' period to submit objections thereto, submitted the same to the district court on December 13, 2022. See Fed. R. Crim. P. 32(e)-(f). The Probation Office determined that Goncalves's base offense level was 32 as per U.S.S.G. § 2D1.1(a)(5) and (c)(4) with a three-level reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a)-(b) for a total offense level of 29. The Probation Office also concluded that Goncalves had a criminal history category of IV. The total guidelines sentencing range was 121 to 151 months plus the additional mandatory five-year minimum consecutive sentence for possessing a firearm in furtherance of a drug trafficking offense.

The Government objected to the PSR's lack of a four-level enhancement under U.S.S.G. § 3B1.1(a).[5] It posited that the enhancement applied due to Goncalves's role in organizing deals with the supplier on his behalf and that of Cody, coordinating deals on behalf of Cody, regular customers going through Goncalves to purchase cocaine from Tony, utilizing multiple people to drive Goncalves to and from drug transactions, using Antunes as a

---

[5] The Government did not object to the absence of a two-level enhancement in the PSR for maintaining a premises for the purpose of manufacturing or distributing a controlled substance.

"runner" to complete transactions, supplying individuals with drugs for distribution and consumption, and being the center of the operation and violence within the area. The Probation Office disagreed, stating:

> [T]he probation officer does not agree that a role enhancement is applicable in this case. Rather, the probation officer suggests that the Court consider an upward departure because although the probation officer does not find that the defendant organized, lead, supervised, or managed another participant, the defendant did exercise a management role in the criminal activity. . . . The probation officer does not view [Goncalves] as organizing deals on behalf of Cody, as it appears that Cody and [Goncalves] worked together in a drug trafficking organization and utilized Felix-Perez as their supplier. The probation officer also fails to view Antunes as a "runner" for [Goncalves]. Antunes is [Goncalves]'s cousin who purchases finger quantities of fentanyl from [Goncalves] and supplied fentanyl to his own customers. With regard to the utilization of Jermaine Gonsalves and Alyssa Miranda to drive [Goncalves] to deal, there is no information to indicate that either party was working for [Goncalves] . . . .

On December 20, 2022, the district court held Goncalves's sentencing hearing. At the outset, it determined that an upward two-level adjustment under U.S.S.G. § 3B1.1(c) was warranted rather than the four-level one requested by the Government under U.S.S.G. § 3B1.1(a) because "although [Goncalves] may not have been a leader, organizer of five or more participants in his drug trafficking organization, he was . . . a manager

and/or supervisor at least of his family members." The district court concluded that Goncalves thus had a total offense level of 31, rather than 29 as suggested by the Probation Office, and a criminal history category of IV, resulting in a guidelines range of 151 to 188 months' imprisonment before "the 60 month on and after sentence for the possession of a firearm in furtherance of drug trafficking." The Government agreed that the district court's position was "reasonable" while Goncalves expressed that the enhancement should not apply.

The Government finally requested a total sentence of 248 months, arguing that Goncalves progressed in his distribution of drugs, elevating from heroin to fentanyl, acquiring large quantities from his supplier, selling drugs with his brothers, taking rides with other members of his "drug crew," and meeting with customers around his home. The Government then argued that the growth of the enterprise was "due really to managing qualities that [the district court] already noted," concluding that the high end of the guideline range was warranted.

Goncalves's counsel, on the other hand, requested a sentence at the lower end of the applicable range as the guidelines are "serious and heavy and they capture [his] conduct." More so, Goncalves himself accepted full responsibility for his actions, noting the impact his actions had on people and their family and friends.

The district court sentenced Goncalves to 230 months, 170 for the drugs plus a consecutive 60 for the firearm followed by five years of supervised release, noting that he was "the leader, manager of a violent, well-armed drug trafficking organization which distributed large quantities of the most deadly drugs on the street, including [f]entanyl." This timely appeal ensued.

After review of the record, we issued a limited remand order requesting further clarification on what facts the district court relied upon to conclude that the U.S.S.G. § 3B1.1 enhancement applied. The district court found that Goncalves "oversaw the distribution and eventual sale of fentanyl that was administered by his cousin and co-defendant, Carlos Antunes." Specifically, the district court highlighted that during the October 2018 deal at the Burger King with Antunes, Goncalves "not only advised Antunes when to meet with the customer but, when that customer did not arrive at the pre-arranged location in a timely fashion, he instructed Antunes, from the safety of the delivering vehicle, as to what Antunes should do."[6] We requested both parties to respond.

---

[6] In finding the managerial or supervisory enhancement to apply, the district court pointed to Goncalves's coordination of drug purchases on behalf of Cody from Goncalves's supplier. However, we find this example unavailing because Goncalves's coordination with Cody alone does not demonstrate that he had any authority over anyone. It only shows that Goncalves acted as a go-between with regard to his supplier and co-defendant. We therefore only focus on the October 2018 Burger King deal.

- 10 -

The Government reiterated the district court's findings of the October 2018 Burger King deal, specifically stating that this was reviewable under clear error and that this finding was not clearly erroneous because it "reflected reasonable inferences from the facts." Goncalves, on the other hand, argued that there was no proof that there were orders given by him which were in fact obeyed by Antunes.

## II. Discussion

### A. U.S.S.G. § 3B1.1

The role enhancement at issue is U.S.S.G. § 3B1.1, under which a district court may increase the defendant's total offense level based on his aggravating role as follows:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1. Ultimately, the district court applied § 3B1.1(c).

The enhancement has two elements: "the sentencing court must supportably find that (i) the criminal activity involved at least two, but fewer than five, complicit individuals (the defendant included); and (ii) in committing the offense, the defendant exercised control over, managed, organized, or superintended the activities of at least one other participant." United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010). We have previously considered proof of both "orders given and obeyed" when determining whether the enhancement applies. Id. The government bears the burden of proving, by a preponderance of the evidence, that the enhancement applies. Id. In this present appeal, it is clear there were at least two individuals involved, therefore the issue lies in the second requirement of whether Goncalves exercised control over, managed, organized, or supervised the activities of another individual.

To apply, a managerial or supervisory role must be "evidenced by some 'manifestation of authority' on the part of the defendant."[7] United States v. García-Sierra, 994 F.3d 17, 37 (1st Cir. 2021) (quoting United States v. Savarese, 686 F.3d 1, 20 (1st

---

[7] Although the district court found that Goncalves was both a manager and leader of his family, on appeal, the government does not contend that he was a leader. Nor is there evidence that he was a leader. Because it is "not error to impose the enhancement as long as the defendant could have been found to be merely a manager or supervisor[,] [w]e therefore focus on whether this lower bar was met." García-Sierra, 994 F.3d at 37 n.10.

- 12 -

Cir. 2012)).  "The authority possessed by the defendant may be fairly minimal; 'a defendant need not be at the top of a criminal scheme to be a manager or supervisor.'"  Id. (quoting United States v. Goldberg, 105 F.3d 770, 777 (1st Cir. 1997)).  The managerial or supervisory enhancement is "proper only where the defendant exercised some degree of authority or control over another criminal actor; that the defendant may have managed or supervised a particular criminal activity is insufficient."  Id. (citing United States v. Prange, 771 F.3d 17, 34 (1st Cir. 2014)).

## B. Standard of Review

While our circuit precedent is inconsistent on the standard of review that should apply, it is not necessary to determine that here.  Regardless of whether clear error or de novo review applies, the record, as discussed infra, is devoid of evidence by a preponderance that would support the finding that Goncalves was a manager or supervisor in this case.[8]

---

[8] Some of our U.S.S.G. § 3B1.1 cases bifurcate the district court's findings of historical fact and its decision whether the enhancement applies.  The former are factual findings, reviewed for clear error, and the latter is a legal determination, reviewed de novo.  United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007); see also United States v. Ofray-Campos, 534 F.3d 1, 39 (1st Cir. 2008); United States v. Gibbons, 553 F.3d 40, 45 (1st Cir. 2009).  Thus, when there is a challenge to the sufficiency of the evidence supporting a role-in-the-offense enhancement, de novo review is applied.  Ramos-Paulino, 488 F.3d at 463 ("A question about whether the evidence is sufficient to support a particular guideline determination is a question of law and, therefore, engenders de novo review.").  Other of our U.S.S.G. § 3B1.1 cases do not distinguish between those two types of decisions and

**C. The District Court's Application of U.S.S.G. § 3B1.1**

As a reviewing court, we must determine whether the district court's findings contain enough particularity to support the enhancement.  Gall v. United States, 552 U.S. 38, 51 (2007) ("Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court . . . must first ensure that the district court committed no significant procedural error, such as failing to . . . adequately explain the chosen sentence . . . .").  "[S]entencing judges need not explain their reasoning in exquisite detail, especially when the reasons are 'evident from the record,'" García-Sierra, 994 F.3d at 38 (quoting United States v. Zehrung, 714 F.3d 628, 631 (1st Cir. 2013)), "[b]ut . . . in the end we must be able to figure out what they 'found and the basis for the findings to the extent necessary to permit effective appellate review,'" Zehrung, 714 F.3d at 632

consider a district court's determination that the defendant performed an aggravating role as a factual finding, or at least a decision that is fact bound, warranting clear error review. García-Sierra, 994 F.3d at 37.  Thus, even when a defendant raises a sufficiency of the evidence challenge, the court applies clear error.  Id.; see also United States v. Illarraza, 963 F.3d 1, 13 (1st Cir. 2020); United States v. Cortez-Vergara, 873 F.3d 390, 393 (1st Cir. 2017); United States v. Perez, 819 F.3d 541, 545 (1st Cir. 2016); Al-Rikabi, 606 F.3d at 14.  We also note that the Supreme Court has recently distinguished between different kinds of mixed questions of law and fact in its discussion of the appropriate standard of review.  See Wilkinson v. Garland, 601 U.S. 209, 222 (2024).  But because we would ultimately vacate the enhancement under de novo or clear error review, we need not address how that distinction might affect the standard of review applicable in this case.

(quoting United States v. Van, 87 F.3d 1, 3 (1st Cir. 1996)); see also United States v. Medina, 167 F.3d 77, 80 (1st Cir. 1999) (noting that when the basis for a role-in-the-offense enhancement is not "apparent from the record . . . the sentencing court, in order to apply such an enhancement, must make a specific finding which identifies those being managed 'with enough particularity to give credence to the upward adjustment'" (quoting United States v. McDowell, 918 F.2d 1004, 1011 (1st Cir. 1990))). "Without reasonably specific findings or some satisfactory surrogate in the record, we are unable to engage in meaningful review to determine whether the decision [to impose a role-in-the-offense enhancement] was clearly erroneous." García-Sierra, 994 F.3d at 38 (alteration in original) (quoting Medina, 167 F.3d at 80). Especially in a case that involves many participants and various transactions, "and where the PSR 'does not even minimally focus on the specific considerations necessary' to support a finding that a defendant occupied an aggravating role in the offense, 'it is necessary that the district judge make sufficient findings to articulate the rationale' for the aggravating role enhancement." Id. (quoting United States v. Catano, 65 F.3d 219, 230 (1st Cir. 1995)).

The Government solely objected to the PSR on the ground that Goncalves "acted as the organizer of the DTO in a number of ways" but, after remand, the Government agrees in its briefing that the district court did not apply the enhancement based on

- 15 -

Goncalves's role as an "organizer," but rather based on his role as a manager and leader. In that regard, the Government posits that since "there is evidence that Goncalves directed his family members on some occasions," the district court may be affirmed on that basis.

Goncalves, on the other hand, argues that the district court's finding that he "exercised control of the organization, at least at the family level" was insufficient to justify a role enhancement under U.S.S.G. § 3B1.1. Specifically, he contends that the record lacks evidence that he directed his family members to perform certain actions and that they, in turn, obeyed said directives.

Our precedent provides that even a single instance of directing another person to perform a task for the criminal enterprise may be enough to support the imposition of the managerial or supervisory enhancement. See García-Sierra, 994 F.3d at 39 (concluding that the § 3B1.1(c) enhancement did not apply in part because "the government point[ed] to no evidence showing that García ever directed a single person to perform a single task for the conspiracy"); United States v. Voccola, 99 F.3d 37, 43-45 (1st Cir. 1996) (concluding that a single directed transaction was sufficient to support imposition of a "manager or supervisor" enhancement under U.S.S.G. § 3B1.1); Ofray-Campos, 534 F.3d at 41 (finding application of the § 3B1.1(c) enhancement not

supported by the record in part because there was no evidence "that any individual performed any acts at [the defendant's] express or implied direction").  And while there are many ways to support a managerial or supervisory enhancement, when the imposition of the enhancement is based on proof of direction, our precedents make clear that there must be "proof of orders given and obeyed." Al-Rikabi, 606 F.3d at 14 (emphasis added).  In these cases, it is not enough to prove that an order was given.  Rather, in order to prove that authority and control was exercised over another participant, there must be proof by a preponderance that the order was obeyed by the other participant.

In response to our limited remand, the district court specifically pointed to evidence in the PSR that Goncalves, during the October 2018 Burger King deal, "not only advised Antunes when to meet with the customer but, when that customer did not arrive at the pre-arranged location in a timely fashion, he instructed Antunes, from the safety of the delivering vehicle, as to what Antunes should do."  This finding shows that Goncalves did indeed instruct Antunes to do something, i.e., texting what Antunes should do since the customer had not arrived.  Cf. Savarese, 686 F.3d at 20 (affirming a managerial role enhancement because a defendant "instructed [his co-defendant], on at least one occasion, exactly what to do when they arrived at" the scene of the crime).

However, the record fails to show by a preponderance of the evidence that Antunes obeyed Goncalves's directives. As stated earlier, it is not sufficient to only point to the order given. It is also necessary to point to the evidence of obeyance. See Al-Rikabi, 606 F.3d at 14. And here, the district court did not point to anything in the PSR or elsewhere supporting by a preponderance that the instruction given was indeed obeyed.

Because the district court did not point to any such preponderance of evidence of obeyance, the enhancement can only be upheld if it was apparent or evident from the record that there was evidence sufficient for the enhancement to nonetheless apply. See García-Sierra, 994 F.3d at 38 (noting that "exquisite detail" is unnecessary when an enhancement is apparent from the record). Because "the district court did not base the enhancement on specific findings," we must "search[] the record (including the [PSR]) in an endeavor to identify any such underlings." Ramos-Paulino, 488 F.3d at 463. "[W]e could affirm if the reasons for the judge's choice are obvious or if the record as a whole provides an explanation." Medina, 167 F.3d at 80.

Here, a review of the PSR itself does not support a finding by a preponderance that the instruction given by Goncalves to Antunes was indeed obeyed. Accordingly, nothing "in the record furnishes an obvious basis for the court's decision that" Goncalves's instruction was obeyed, therefore proving control or

- 18 -

authority over Antunes, warranting the enhancement.  <u>Medina</u>, 167 F.3d at 80 (finding that even the "minutiae of the government's surveillance" was insufficient to prove the defendant exercised any control over others).  This "sparse record leaves too much to guesswork."  <u>Al-Rikabi</u>, 606 F.3d at 15.  "When a district court applies a two[-]level enhancement under U.S.S.G. § 3B1.1(c), we cannot be left to speculate about the defendant's managerial activities."  <u>Medina</u>, 167 F.3d at 80.

## III. Conclusion

For the reasons above, we **<u>vacate</u>** the sentence and **<u>remand</u>** for resentencing without the enhancement in light of this opinion.

**-Dissenting Opinion Follows-**

**HOWARD**, **Circuit Judge, dissenting**.  I agree that the district court's findings, both at sentencing and in response to our order, are sparse.  However, on proper review for clear error, those findings adequately support the district court's discretionary decision to impose the managerial enhancement.

## I.

In my view, our cases make plain that we should review for clear error in this circumstance.  Whether Goncalves "controlled" Antunes is a factual question, as the majority seemingly acknowledges.  Slip. Op. at 18, 19 (characterizing the district court's control determination as a "finding").  Thus, even under the more stringent standard of review applied in some of our cases, we would review for clear error.  See United States v. Ofray-Campos, 534 F.3d 1, 39 (1st Cir. 2008) ("We review a sentencing court's findings of fact for clear error, while questions of law involved in sentencing determinations are reviewed de novo.").  And if we were to consider the district court's decision as an application of law to fact, our recent cases instruct us to review with the same deference.[9]  See United States

---

[9] The majority observes a possible temporary departure from this standard in some of our older cases, surfacing three in which we stated that a district court's application of the §3B1.1 standard to undisputed facts engenders de novo review.  See Ofray-Campos, 534 F.3d at 39; United States v. Gibbons, 553 F.3d 40, 45 (1st Cir. 2009); United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007).  But these cases are plainly inconsistent with those that preceded and succeeded them, as they rely on cases

v. Rodriguez, 115 F.4th 24, 51-52 (1st Cir. 2024); United States v. Ilarraza, 963 F.3d 1, 13 (1st Cir. 2020); United States v. Cortez-Vergara, 873 F.3d 390, 393 (1st Cir. 2017); United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010).

To put a finer point on it, however, I think we would do well to adhere to the emerging trend in our cases "to give due deference to the district court's application of the Guidelines to the facts."  United States v. Carvajal, 85 F.4th 602, 611 (1st Cir. 2023) (quoting United States v. Andino-Morales, 73 F.4th 24, 43 (1st Cir. 2023)).  Indeed, such an approach would be in keeping with language of the statute governing our review, which requires that we give "due regard to the opportunity of the district court to judge the credibility of witnesses" and "due deference to the district court's application of the guidelines to the facts."  18 U.S.C. § 3742(e) (emphasis added).  And, as the Supreme Court has noted, precisely "what kind of . . . 'deference that is due depends

that trace back to United States v. Tardiff, 969 F.2d 1283 (1st Cir. 1992), and United States v. Rehal, 940 F.2d 1 (1st Cir. 1991), where we said that the standard of review was exactly the reverse. Tardiff, 969 F.2d at 1289 ("[w}e review the lower court's application of the guideline to a given set of facts only for clear error"); Rehal, 940 F.2d at 5 (same).  And regardless, under the law-of-the-circuit doctrine, our more recent course-correction controls.  See United States v. Guerrero, 19 F.4th 547, 552 (1st Cir. 2021) ("[O]nce a panel decides a legal issue . . ., that ruling usually binds later panels too -- even where the succeeding panel disagrees with the prior one."); see also San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 34 (1st Cir. 2010) ("A previously decided case . . . cannot trigger an exception to the law of the circuit rule.").

on the nature of the question presented.'" Buford v. United States, 532 U.S. 59, 63 (2001) (quoting Koon v. United States, 518 U.S. 81, 98 (1996)).

In considering what deference is due here, I acknowledge that the district court had only a written transcript of recordings, rather than live testimony about the so-called Burger King incident, and that we have access to the same evidence. But inherently embedded in the district court's application of §3B1.1 were its assessments of Goncalves's credibility, a "unique 'responsibility'" of the court expressly afforded "due regard" on appeal by § 3742(e). Carvajal, 85 F.4th at 612 (quoting United States v. Nagell, 911 F.3d 23, 31 (1st Cir. 2018)); 18 U.S.C. § 3742(e). From our perch on review, we simply have no way to revisit the credibility of either Goncalves's attestations at his change-of-plea hearing about his role in the drug operation or his allocution at sentencing. Likewise, this district court also sentenced Goncalves's co-conspirators in separate proceedings, putting it in a better position than we are to sort out the respective roles of him and his co-conspirators.

I also note, as the majority does, that the Supreme Court's recent decisions (albeit in other contexts) have begun to delineate between mixed questions of law and fact that "immerse courts in case-specific factual issues" and mixed questions that "require courts to expound on the law . . . by amplifying or

- 22 -

elaborating on a broad legal standard." Wilkinson v. Garland, 601 U.S. 209, 222 (2024) (alteration in original) (quoting U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC, 583 U.S. 387, 396 (2018)). The factual nature of the former questions, the Court has counseled, "suggests a more deferential standard of review." Id. The legal nature of the latter, on the other hand, means that we should typically review those questions de novo. U.S. Bank, 583 U.S. at 396.

Applied in this context, we should only review de novo a district court's application of §3B1.1 when our review requires us to clarify our position on the related legal standards. Otherwise, when the appeal predominantly concerns a review of the factual record before the district court, we correctly review with deference. See United States v. Tripplet, 112 F.4th 428, 434-36 (6th Cir. 2024) (Murphy, J. concurring) (contending that appellate courts should give deference to district courts' sentencing decisions presenting a "mixed question [that] 'immerse[s] courts in case-specific factual issues'" (second alteration in original) (quoting U.S. Bank, 583 U.S. at 396)).

I see the question before us as "immersing" us in "case-specific factual issues." Wilkinson, 601 U.S. at 222. Goncalves does not ask us to clarify, amplify, or elaborate upon the legal definition of "manager" in §3B1.1. Cf. United States v. García-Sierra, 994 F.3d 17, 37 (1st Cir. 2021) (reviewing similarly

fact-based challenge to application of supervisor-role enhancement for clear error). Rather, he merely asks us to reassess whether facts that the district court culled from the presentence report support its finding. Such a request, in my view, requires us to review the district court's decision for no more than clear error.

## II.

Affording that deference, in turn, compels the conclusion that we should affirm. It is undisputed that whether Goncalves was a manager turns on whether he exercised "authority or control" over another criminal participant on at least one occasion. Id. In the majority's view, the government can establish "authority or control" in exactly one way: by demonstrating that a defendant issued an order to another criminal participant and that the participant obeyed that order. Accordingly, the majority zeroes in on the district court's finding that Goncalves "instructed Antunes." Because there is no complementary finding that Antunes obeyed that instruction, the majority reasons, the district court clearly erred when it concluded that Goncalves controlled Antunes. But, of course, the record is clear that the transaction took place as planned soon after the instruction was issued. In my view, we should not ignore the plausible inference, obvious from the record, that Antunes obeyed the instruction or that the instruction became moot because the buyer appeared in the meantime. In all events, there was no

- 24 -

countervailing evidence even hinting that Antunes disobeyed or would have disobeyed the instruction -- and "[w]here the undisputed facts support more than one plausible inference, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Garcia, 34 F.3d 6, 10 (1st Cir. 1994). Thus, even adopting the majority's narrow construction of "authority or control," the district court's finding should stand.

That said, I also do not understand our "authority or control" standard to be so particular as the majority makes it out to be. In United States v. Al-Rikabi, we certainly suggested that, if the record there had contained "proof of orders given and obeyed," the district court could have imposed the managerial enhancement. 606 F.3d 11, 14 (1st Cir. 2010). But we did not say that such a showing was the only way for the government to meet that standard. Far from it. We gave many other examples of record evidence that could have justified the enhancement, such as proof that the defendant "paid [a criminal participant] for her services," that the defendant and the participant were in "a committed relationship," or that the pair engaged in "an exclusive course of dealing." Id. Because we concluded that the record lacked any such "proof that [the participant] was either subservient to the [defendant] or subject to his hegemony," we vacated the enhancement. Id.

The record before us, in my view, contains exactly what we found lacking in Al-Rikabi -- namely, evidence that a criminal participant (Antunes) was subservient to the defendant (Goncalves). Of course, the government's case was far from robust. That Goncalves issued instructions to Antunes "from the safety of the delivering vehicle" while Antunes sold Goncalves's fentanyl does not necessitate a conclusion that Goncalves outranked his cousin. But it does intimate that Goncalves directed Antunes to sell the fentanyl on Goncalves's behalf. Cf. United States v. Akitoye, 923 F.2d 221, 227 (1st Cir. 1991) (holding that a defendant exercised control over another person by "retain[ing] dominion" over the drugs that person sold); United States v. Savarese, 686 F.3d 1, 20 (1st Cir. 2012) (affirming a managerial role enhancement because a defendant "instructed [his co-defendant], on at least one occasion, exactly what to do when they arrived at" the scene of the crime). And the government can rest its case on "wholly circumstantial" evidence. United States v. García-Morales, 382 F.3d 12, 20 (1st Cir. 2004). Thus, I cannot conclude that the district court clearly erred in finding that Goncalves controlled Antunes.