# United States Court of Appeals
## For the First Circuit

No. 24-1583

UNITED STATES OF AMERICA,

Appellee,

v.

ADAM JOHNSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Montecalvo, Kayatta, and Rikelman,
Circuit Judges.

Ronald W. Bourget for appellant.
Brian S. Kleinbord, Assistant U.S. Attorney, with whom Craig
M. Wolff, Acting U.S. Attorney, was on brief, for appellee.

May 28, 2026

**KAYATTA**, <u>Circuit Judge</u>.  A jury convicted Adam Johnson of conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A).  On appeal, Johnson contends that the proceedings below were tainted by the court's failure to hold an evidentiary hearing before denying his motions to exclude his plea and cooperation agreements as well as his grand jury testimony.  Johnson also challenges his sentence, asserting that the court erred in enhancing his offense level based on testimony of a deceased witness and in refusing to grant him credit for acceptance of responsibility despite his prior cooperation.

Finding Johnson's arguments either unpreserved or lacking merit, we <u>affirm</u> the verdict and sentence.  Our reasoning follows.

## I.

This case presents an unusual procedural history spanning over half a decade, five different defense attorneys, and two district court dockets.

On February 21, 2018, New Hampshire State Police stopped Johnson for a defective taillight and found fifty-three grams of heroin on his person.  Johnson confessed to purchasing drugs and provided information regarding several distributors, after which he was extradited to Maine on a warrant for a failure to appear in a separate matter.  Upon his return to Maine, Johnson enrolled as

a confidential source (CS) for the Drug Enforcement Agency (DEA). He entered into two agreements with the DEA, beginning on May 31, 2018. [1] The DEA anticipated that, in exchange for his cooperation -- which included providing real-time information to agents and disclosing information about his suppliers -- Johnson would not be charged with possessing heroin at the time of his February arrest.

But Johnson's work as a CS did not itself entitle him to immunity from any and all criminal charges. Around January 3, 2019, the government served Johnson with a target letter stating that they had received "substantial evidence relating to [his] violation of federal narcotics trafficking laws." Johnson received his first appointed counsel at that point. Although he had been terminated as a CS for the DEA, Johnson continued to cooperate with the government through proffers to government agents on March 27, 2019, and again on October 29, 2019.[2] In the

---

[1] The first agreement pertained to work as a CS from May 31, 2018, through September 1, 2018. The second agreement pertained to work as a CS from September 1, 2018, through December 1, 2018. The DEA deactivated Johnson as a CS on November 29, 2018, due to his incarceration.

[2] Johnson signed a "proffer" agreement on March 27, 2019, which provided that "[i]n any prosecution brought" against him, "the Government will not offer in evidence in its case-in-chief . . . any statements made by [Johnson] at the meeting, except in a prosecution for false statements, obstruction of justice or perjury with respect to any acts committed or statements made during or after the meeting or testimony given after the meeting."

intervening months, Johnson's first counsel withdrew due to a conflict of interest. During the October proffer, the government provided to Johnson and his new appointed counsel an overview of the proposed plea and cooperation agreements. At some point, Johnson agreed to testify before a grand jury to assist the government in its prosecution of other drug distributors.

On December 11, 2019, minutes prior to testifying before the grand jury, Johnson signed the cooperation and plea agreements. The plea agreement contained a provision stating that, in the event of a breach by Johnson, "[t]he United States may use any statement that [Johnson] made pursuant to this Agreement, including statements made during plea discussions and plea colloquies, and the fact that [Johnson] pleaded guilty." Additionally, Johnson agreed to "waive[] any claim under Rule 410 of the Federal Rules of Evidence or Rule 11(f) of the Federal Rules of Criminal Procedure that such statements and guilty plea are inadmissible" in the event of such breach.

The cooperation agreement also contained a provision titled "Consequences of Breach," which provided that, if Johnson "violates or fails to perform any obligations under this Agreement or under the plea agreement ('a breach'), the United States will be released from its obligations hereunder and may fully prosecute [Johnson]." As most relevant to this appeal, under Section A of the breach provision, Johnson agreed that the government could

- 4 -

"use any statement that [he] made pursuant to [the] Agreement, including statements made during proffers, debriefings, [and] grand jury sessions" in the event of breach. He further "waive[d] any claim under Rule 410 of the Federal Rules of Evidence or Rule 11(f) of the Federal Rules of Criminal Procedure that such statements and guilty plea are inadmissible."

When Johnson signed the final written agreements just before testifying to the grand jury, his appointed counsel was not present. Rather, he was represented by "fill-in" counsel arranged by his attorney. There is no claim, however, that either written agreement differed in relevant substance from what was discussed at the October meeting between Johnson, his appointed counsel, and the government. In his testimony before the grand jury, Johnson confirmed both that he had had enough time to discuss the agreements with the substitute attorney and that he was comfortable proceeding with the substitute attorney. Johnson further admitted to distributing fentanyl and heroin to support his addiction, and he named his supplier and other distributors. When asked if he hoped to receive a lower sentence for his cooperation, Johnson responded, "Yes."

The following month, on January 29, 2020, the government filed an information charging Johnson with conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), and

841(b)(1)(A). Johnson was first scheduled to plead guilty to this information on February 12, 2020 -- the same date of his arraignment on the information and his waiver of indictment. That hearing was initially rescheduled for unknown reasons to February 28 and then to March 25, 2020. On March 19, 2020, the court again rescheduled Johnson's hearing to May 13, 2020, in accordance with the COVID-19 pandemic general orders. On April 20, 2020, Johnson's appointed counsel filed a motion to withdraw from his case. The court granted that motion and cancelled the May 13 hearing via minute order, stating it would reschedule the hearing when "the Court resume[d] in-court appearances." On October 8, 2020, Johnson's new attorney -- his third to that point -- filed a motion requesting his plea hearing be continued. After several more continuances, on August 24, 2021, the plea hearing was cancelled. A few weeks later, Johnson's attorney filed a motion to withdraw from his case. The district court made its grant of the motion "contingent upon [Johnson] submitting a new financial affidavit and it being approved by the Court." Neither Johnson nor his attorney submitted a new financial affidavit.

On October 14, 2021, 51 days after the cancellation of Johnson's most-recently scheduled guilty plea hearing, the government filed a letter stating it would no longer be pursuing the information in the original case, No. 20-cr-00015, and would

instead be indicting Johnson on the same charges in a new case, No. 21-cr-00156. In its letter, the government did not allege that Johnson had breached his plea agreement.

Following entry of the indictment, Johnson was again scheduled to plead guilty. After a continuance, Johnson cancelled his hearing. His appointed counsel -- his fourth since the initial target letter -- then filed a motion on April 28, 2022, requesting a continuance to allow counsel time to prepare for trial and file pretrial motions, stating that, "[a]fter further deliberations," Johnson "ha[d] elected to proceed forward to trial."

In October 2022, Johnson's attorney filed a motion in limine to exclude statements Johnson made subsequent to signing the plea and cooperation agreements, including his testimony before the grand jury. Johnson's attorney reiterated that Johnson "ha[d] made the decision to proceed to trial, rather than enter a plea," and that "[t]he Government has indicated it views this as a breach of the Agreements . . . and therefore intends to use [Johnson's] statements made subsequent to the execution of the Agreements at trial, including statements he made before the grand jury." In the motion in limine, Johnson's attorney argued Johnson's entry into the agreements was not knowing, contending that his then-attorney never reviewed the agreements with him and was not present when he signed the agreements; that his then-attorney did not provide him with discovery; that he never

- 7 -

entered a guilty plea in compliance with Federal Rule of Criminal Procedure 11(f); and that he did not understand the consequences of waiving his rights under the agreements.

In response, the government presented evidence to the contrary, including Johnson's sworn testimony before the grand jury, where he affirmed that he wished to proceed with the substitute attorney; that he had had sufficient time to review the agreements with that attorney; and that he understood that, if he provided false testimony, he "could receive extra charges" or "lose any rights that [he] had during the proffer agreement." In August 2023, the district court denied Johnson's motion in limine and granted the government permission to introduce Johnson's statements at trial. Considering Johnson's testimony before the grand jury and the absence of any "reasonable alternative explanation" indicating a lack of knowledge, the district court found Johnson had knowingly entered into the plea agreement and then subsequently breached it by refusing to enter the agreed-upon plea.

Months later and just a few days prior to Johnson's jury trial, Johnson's new -- and fifth -- attorney filed another motion in limine to exclude the plea agreement and grand jury testimony on the basis that Johnson believed "the plea agreement was placed into negotiation" and that "it was the government who breached the [plea] agreement," not Johnson. The motion also restated that

Johnson did not understand the plea agreement. The court orally denied the motion. Three days later, the court empaneled a jury, which found Johnson guilty as charged.

After his conviction, the probation office prepared a Presentence Investigation Report ("PSR") with its sentencing recommendations pursuant to the United States Sentencing Guidelines ("Guidelines"). The PSR recommended a sentencing enhancement for Johnson's role as an "organizer or leader" of criminal activity pursuant to Guidelines section 3B1.1 and suggested that Johnson receive no credit for acceptance of responsibility under section 3E1.1. In his PSR objections and sentencing memorandum, Johnson both opposed the characterization of his role as an "organizer or leader" and requested credit for acceptance of responsibility despite having taken his case to trial.

The court was not convinced. At the sentencing hearing, the court overruled Johnson's objection to the "organizer or leader" enhancement and adjusted his offense level upwards by four points. The court also declined to grant Johnson credit for acceptance of responsibility under section 3E1.1 of the Guidelines. The court reasoned that "[e]ven after originally agreeing to plead guilty, Mr. Johnson elected to go to trial and disputed whether he conspired to distribute and possess with the intent to distribute 400 grams or more of fentanyl," and that

- 9 -

"[m]any of Mr. Johnson's objections to the PSR continue to contradict the jury's verdict."[3] And after hearing Johnson's allocution, the court found that Johnson had failed to "embrac[e] with humility [his] role" in the offense. In light of all the factors before it, the court concluded Johnson had not presented "extraordinary circumstance[s]" that would warrant granting him two or three points for acceptance of responsibility. The court did, however, grant Johnson a variance for "at least gesturing toward something like acceptance" for his initial willingness to cooperate with the government.

Ultimately, the district court sentenced Johnson to a below-Guidelines sentence of 180 months in custody. This appeal followed.

## II.

On appeal, Johnson makes three arguments. First, he contends that the court erred in denying his motions to exclude statements made in his grand jury testimony and pursuant to his plea and cooperation agreements. In support of this argument, Johnson asserts that he did not knowingly or voluntarily sign the agreements and that the court should have held an evidentiary

---

[3] The court emphasized that it did not "know what led to [Johnson's] decision to withdraw from the plea and cooperation agreements," but that it had been "concerned" to learn that Johnson "had forfeited whatever benefits would have been realized" through the agreements, had he not gone to trial.

- 10 -

hearing before resolving his motions.  Second, Johnson asks us to find error in the court's assessment that he qualified as an "organizer or leader" of the distribution conspiracy based on statements in the PSR made by a deceased witness who did not testify at trial.  Third, Johnson posits that the court should have granted him a two-point variance for acceptance of responsibility for his pretrial cooperation.

We address each argument in turn.

### A.

We begin with Johnson's argument regarding his motions in limine.  As best we can tell from his brief and oral argument, Johnson actually presents two types of arguments here -- one procedural and one substantive.  Procedurally, Johnson contends that the court should have held an evidentiary hearing prior to denying his motions in limine.  Substantively, Johnson asks us to find that the court erred in determining that he knowingly entered into the plea and cooperation agreements, and he presents a new, undeveloped argument that he did not enter into the agreements voluntarily.

### 1.

We first dispose of Johnson's assertion that the court erred in failing to hold an evidentiary hearing prior to denying his motions in limine.  The government contends Johnson's argument is unpreserved, as Johnson failed to request an evidentiary hearing

before the district court. We agree. In his briefings on appeal, Johnson does not point to any part of the record suggesting a request for an evidentiary hearing. At oral argument, Johnson's counsel directed this court to three separate places in the record that he says may have contained such a request, namely one of prior counsel's motions in limine, a sidebar at a hearing on a separate motion to suppress, and a motion for acquittal filed after trial. Upon reviewing the record, however, we find no indication that Johnson requested any sort of motion hearing. Despite filing two motions in limine with two separate attorneys, Johnson failed to request any hearing on the exclusion issues he had raised. In the transcript of the sidebar at the motion-to-suppress hearing, Johnson's counsel provided the court with notice that he would file a "future motion" regarding Johnson's cooperation. But we do not read a vague reference to a future motion as a request for a hearing on the matter. And in his motion for acquittal, Johnson argued that the court should exclude his admissions in the plea and cooperation agreements. Again, he made no argument regarding the court's failure to hold an evidentiary hearing on the matter.

"If a litigant believes that an error has occurred . . . during a federal judicial proceeding, he must object in order to preserve the issue." Puckett v. United States, 556 U.S. 129, 134 (2009). Johnson "cannot fault the district court for not holding an evidentiary hearing where he 'did not seasonably request such

- 12 -

a hearing.'" United States v. Perez-Segura, 126 F.4th 784, 788 (1st Cir. 2025) (quoting United States v. Gertner, 65 F.3d 963, 970 (1st Cir. 1995)).

We therefore review only for "plain error." Fed. R. Crim. P. 52. "Plain error is a formidable standard of review, which requires [Johnson to] demonstrate: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Papantoniadis, 165 F.4th 65, 93 (1st Cir. 2026) (second alteration in original) (quoting United States v. Candelario-Ramos, 45 F.4th 521, 525 (1st Cir. 2022)).

There was no clear or obvious error here. "[T]he decision of whether to conduct an evidentiary hearing is left to the sound discretion of the district court." United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010). We begin our review of that discretion by asking whether "the movant [has made] an adequate threshold showing that material facts are in genuine doubt or dispute." United States v. Lilly, 983 F.2d 300, 310 (1st Cir. 1992) (citing United States v. Panitz, 907 F.2d 1267, 1273-74 (1st Cir. 1990) (collecting cases applying this standard)).

The only disputed facts we can find in this record pertinent to the motions in limine are the contradictions created by Johnson's own conflicting arguments: In his first motion in

- 13 -

limine, Johnson's attorney admitted that Johnson "ha[d] made the decision to proceed to trial, rather than enter a plea"; in his second motion in limine, Johnson contended that "the plea agreement was placed into negotiation" and that "it was the government who breached the [plea] agreement," not him. But Johnson failed to present even a sworn affidavit, let alone any other evidence, that would support either assertion. Cf. United States v. Calabrese, 645 F.2d 1379, 1390 n.2 (10th Cir. 1981) (finding that allegations of harassment by government agents "in an unsworn pleading" did not suffice to "warrant an evidentiary hearing on the issue of breach" in the face of sworn statements submitted by the government).

Without showing any dispute of material fact that could have clearly required the district court to hold an evidentiary hearing, Johnson's unpreserved challenge to the court's decision not to hold a hearing fails.

## 2.

We now turn to Johnson's substantive challenge to the denial of his motions in limine to exclude his plea and cooperation agreements, his statements made pursuant to those agreements, and his resulting grand jury testimony. To this end, Johnson asserts, first, that he did not voluntarily enter into the agreements because he "was rushed and without his counsel when reviewing the documents," and, second, that he did not knowingly enter into the

- 14 -

agreements, either because the government had not provided his attorney with discovery regarding his cooperation, or his attorney had not provided him with such discovery.

"Basic contract principles apply to the construction of plea agreements," and we construe ambiguities in such agreements against the government. United States v. Newbert, 504 F.3d 180, 185 (1st Cir. 2007). We review "questions of law as to the construction of the agreement" de novo. Id. at 184. We review factual findings for clear error. Id. at 185.

### i.

First, Johnson contends that because he was "rushed" to sign the plea and cooperation agreements without appointed counsel present, "[t]he process was insufficient to constitute any voluntary waivers regarding the materials in the documents." But Johnson never presented this voluntariness argument below. In his two separate motions in limine before the district court, Johnson chose only to challenge his lack of knowledge regarding the agreements, not whether he had entered them voluntarily. We review "forfeited theories" for plain error. United States v. Rivera-Morales, 961 F.3d 1, 12 (1st Cir. 2020). And where a "[defendant's] brief fails to even mention plain error, let alone argue for its application," he "waives [his] forfeited claim." United States v. Martínez-Mercado, 132 F.4th 61, 68-69 (1st Cir.

- 15 -

2025) (first quoting United States v. Cruz-Ramos, 987 F.3d 27, 40 (1st Cir. 2021)). Such is the case here.

Even if we construe his logic as a preserved argument that he did not knowingly enter into the agreements, Johnson's sworn testimony before the grand jury belies his contention that he did not knowingly sign the plea and cooperation agreements because he was "rushed" to sign the agreements without his court-appointed attorney. Johnson testified before the grand jury just minutes after reviewing the agreements. When asked whether he "fe[lt] comfortable going forward" with substitute counsel, Johnson affirmed that he did. He further affirmed that he had sufficient time to discuss the plea and cooperation agreements with substitute counsel and that he agreed to plead guilty to a federal drug offense and to cooperate with the government. When asked what would happen if he provided false testimony, Johnson responded that he "could be receiving extra charges" or "lose any rights that [he] had during the proffer agreement." We therefore agree with the district court's assessment that Johnson had "provided testimony to the grand jury" wherein he "affirm[ed] . . . a clear understanding of his obligations and benefit of his bargain pursuant to the agreements' terms."

Importantly, this is not a case in which the substance of either a plea agreement or a cooperation agreement was first disclosed minutes before signing. We have a record here of

Johnson's "participation in the plea negotiation process" as well as "the length of the period during which plea negotiations persisted." United States v. Adams, 971 F.3d 22, 39 (1st Cir. 2020). Prior to signing the plea and cooperation agreements, Johnson had met with the government and his attorney on two separate occasions -- on March 27, 2019, and October 29, 2019 -- to proffer regarding his involvement in drug trafficking. On the latter occasion, the government provided Johnson and his attorney with an overview of the proposed plea and cooperation agreements. Indeed, the report of that second proffer session states that the government "explained the Plea and Cooperation Agreement the United States Attorney's Office was proposing to [Johnson]" and that, although he had not yet "been provided a copy" by his attorney, "[Johnson] indicated that he understood the tenets of the [proposed] agreement." Nor does Johnson's own behavior suggest that he was uncomfortable with the agreements. Johnson signed the plea and cooperation agreements on December 11, 2019. Despite being repeatedly scheduled to plead guilty over the course of nearly three years, the first time Johnson ever raised the issue regarding a lack of knowledge in entering into the plea and cooperation agreements was on October 7, 2022, after choosing to proceed to trial rather than plead.

Johnson also urges us to find error in the court's denial of his motions in limine because he did not have discovery pertaining to his work as a CS prior to entering into the plea and cooperation agreements. While the government may not suppress "evidence favorable to an accused . . . [that] is material either to guilt or to punishment," Brady v. Maryland, 373 U.S. 83, 87 (1963), "[t]here is no general constitutional right to discovery in a criminal case," Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Indeed, the Supreme Court has held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." United States v. Ruiz, 536 U.S. 622, 633 (2002). Johnson's argument is not that the government withheld exculpatory evidence in violation of his due process rights. Rather, he asks us to find that he did not enter the agreements knowingly because he did not have discovery of evidence chronicling his prior cooperation. Johnson provides no developed argumentation or case law to support this contention, nor does he explain how the inability to review his CS agreements affected his understanding of the plea and cooperation agreements. The argument is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work,

create the ossature for the argument, and put flesh on its bones.").[4]

We find the substantive challenges to the court's ruling on the motions in limine unavailing.

**B.**

We next turn to Johnson's argument that the court erred in adjusting his offense level under section 3B1.1 of the Guidelines because it relied on the statements of an unavailable witness. The court's reliance on these statements was error, says Johnson, because he was unable to cross-examine the witness, who was deceased at the time of sentencing.

**1.**

This circuit has evidenced some inconsistency in the manner in which it reviews role adjustments under section 3B1.1, sometimes applying clear error and other times using a mix of de novo review for legal issues and clear error for factual ones. See United States v. Goncalves, 123 F.4th 580, 586 n.8 (1st Cir. 2024). Because we find that Johnson's arguments fail on both de

---

[4] At the end of his argument regarding the lack of discovery, Johnson asserts that "[t]he legal impact of the agreements should have been addressed in the plea and cooperation agreement, or at the time of the plea and cooperation agreement." Whether read as a point in support of his discovery argument or a separate argument altogether, this contention -- confined to a single sentence without a citation to the record or case law -- similarly fails for a lack of development.

novo and clear error review, we need not resolve that inconsistency.

<h2 align="center">2.</h2>

We begin with the text of section 3B1.1, which provides, in relevant part:

> If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels.

U.S.S.G. § 3B1.1(a). The comments to the Guidelines also detail "[f]actors [a] court should consider" in determining whether an individual exercised a leadership role, including the extent of his "decision-making authority," his "recruitment of accomplices," and "the degree of control and authority [he] exercise[s] over others." Id. § 3B1.1 cmt. n.4. The burden is on the government to prove "the applicability of upward role-in-the-offense adjustments by a preponderance of the evidence," such that the evidence presented "satisfies both the scope and status requirements." United States v. Poliero, 81 F.4th 96, 99 (1st Cir. 2023) (first quoting United States v. Rivera, 51 F.4th 47, 51 (1st Cir. 2022)). As to the scope requirement, the evidence must "show[] that the enterprise involved five or more participants or was otherwise extensive"; as to the status requirement, "the government must show that the appellant acted as an organizer or leader of the enterprise." Id. at 99–100 (citation modified).

- 20 -

The district court first found the scope requirement met, as the conspiracy involved "at least five individuals," including McKayla Burns, Megan Burns, Nicholas Culver, Destiny Alton, and an individual by the name of Sara or Sonya Englehart.[5] The record supported this finding. In addition to the five listed individuals, the conspiracy also included Erica Nunez and Wilfred Pimentel, who were Johnson's primary suppliers according to the PSR. And at Johnson's trial, McKayla and Megan Burns, Culver, and Alton all testified to receiving or purchasing heroin and/or fentanyl from Johnson. Megan Burns testified that Johnson would "front" or "loan" drugs to individuals until they could pay him back. Culver affirmed as much when he testified that Johnson would "front" him drugs and Culver would pay him back "after [he] sold" the drugs to others. During the trial, a DEA special agent testified that Johnson would travel to his supplier's house, after which he would "provide Mr. Culver with a bulk of what he would come back with so Mr. Culver could deal with the retail customers because Mr. Johnson no longer wanted to do that." The agent also testified that McKayla Burns would help Johnson sell drugs and, on one occasion when Nunez traveled from her base of operations in

_____

[5] Throughout the record and the parties' briefing, Englehart appears variously as "Sara Englehart," "Sara Engelhart," "Sonya Englehart," and "Sonya Englehardt." We defer to Johnson's spelling and refer to this individual as "Englehart."

Massachusetts to Maine, assisted Johnson in coordinating meetings between Nunez and local buyers.

The PSR recounted much of this testimony and also included statements from one of the coconspirators who died prior to trial -- Englehart. These statements included Englehart's reports of purchasing heroin and fentanyl from Johnson, accompanying him to Massachusetts to purchase drugs from his supplier, and lending Johnson her then-boyfriend's truck so he could make one of his trips to purchase drugs. According to the PSR, Englehart "took direction" from Johnson on one of their trips to Massachusetts. Based on Englehart's statements and the testimony of other witnesses at trial, the PSR determined that Johnson "had a significant customer base," "recruited individuals, such as [Englehart]," "hired individuals to transport him to Massachusetts," "allowed some customers to obtain drugs on consignment," and "introduced others to [his supplier]." This evidence convinces us that the district court did not err in finding the scope requirement satisfied.

Relying on Englehart's statements, the court also found the status requirement met, as Johnson initially "recruited Englehart"; he gave her directions; he involved her in a trip to Massachusetts to purchase drugs; and he "compensated" her with a small portion of the drugs. Under these circumstances, the court reasoned that Johnson "exercised some degree of control over

others" or was "responsible for organizing others for the purpose of carrying out the crime," such that he acted as a "leader or organizer." The court accordingly adjusted his offense level upwards by four points.

Now on appeal, Johnson argues that the court erred in relying on Englehart's statements in the PSR as to the scope and status of his role in the offense. We are not persuaded. "During a sentencing hearing, neither the Federal Rules of Evidence nor the Sixth Amendment's confrontation clause applies," though a court must be mindful to comply with "due process considerations and the parameters of Federal Rule of Criminal Procedure 32." United States v. Rondón-García, 886 F.3d 14, 21 (1st Cir. 2018); see Fed. R. Crim. P. 32 (laying out sentencing procedure). In assessing out-of-court statements at sentencing, a court must therefore ensure that the statements bear "sufficient indicia of reliability to meet the requisite preponderance of the evidence standard" and that the defendant be given "notice" prior to a statement's use and "the opportunity to challenge its reliability." Id. at 23 (citation modified).

We find those requirements met here. We have previously recognized that a PSR "generally bears sufficient indicia of reliability," though, of course, "the mere inclusion in the PSR of factual allegations does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into

facts a district court may rely upon at sentencing." United States v. Carrión-Meléndez, 26 F.4th 508, 512 (1st Cir. 2022) (citation modified). Here, Englehart's statements were obtained from records of her grand jury testimony following an immunity agreement with the government. The statements were also coextensive with the testimony of other coconspirators at trial regarding Johnson's contacts in Massachusetts, his travel to meet with them, and the types of drugs he purchased and sold. See United States v. Lee, 892 F.3d 488, 492 (1st Cir. 2018) (finding it proper for the court to rely on out-of-court witness statements from grand jury testimony or proffer interviews contained in the PSR that are "internally consistent, and mutually corroborative" as to associate names and specific locations linked to drug distribution). We also see no issue with notice, as Johnson learned of Englehart's statements through the amended PSR, and he had the opportunity to challenge the reliability of these statements in his PSR objections and sentencing memorandum prior to sentencing.

Johnson chose to cabin his challenges to Englehart's lack of reliability by asserting that she was a "severe opiate addict." But he offers no evidence that Englehart's addiction rendered her grand jury testimony so unreliable as to preclude the court from deeming it credible. As we have previously held, "[m]erely asserting, without more, that the evidence before a

sentencing court was insufficient, does not raise a dispute as to the validity of a PSR's recommendations." United States v. Cox, 851 F.3d 113, 124 (1st Cir. 2017). We therefore agree with the district court's conclusion that Johnson's objections were "merely rhetorical" and "unsupported by any countervailing proof." The court was thus "entitled to rely on the facts in the PSR." United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003).

We are also not swayed by Johnson's contention that he lacked a leadership role because he was merely "sharing drugs back and forth" within a group of friends. We have previously held that "[a] criminal enterprise that conducted its operations under the aegis of a formal organization chart would be a rarity. Typically, such enterprises are structured informally and, therefore, a defendant's role in the enterprise 'is necessarily fact-specific.'" United States v. Mejia, 55 F.4th 1, 11 (1st Cir. 2022) (quoting United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995)). That Johnson was distributing to and recruiting his friends does not change the analysis here. So long as Johnson gave orders and there is "proof by a preponderance that the order was obeyed by the other participant," it was not error for the district court to find that he exerted authority and control. Goncalves, 123 F.4th at 588. We conclude that standard is met here by Englehart's testimony, as well as by the trial testimony, evincing that Johnson was the point person for his suppliers in

Massachusetts and decided when to introduce other individuals to them; that Johnson would "loan" drugs to other distributors and coordinate for them to sell drugs to the customer base; and that he coordinated meetings between his supplier and local buyers when his supplier traveled to Maine.

Against this backdrop, we decline to disturb the four-point upward adjustment for Johnson's role as an "organizer or leader" of the drug trafficking scheme pursuant to section 3B1.1.

## C.

This leaves us with Johnson's final argument that the court should have granted him credit for acceptance of responsibility.

## 1.

This court reviews a district court's factual determination as to whether a defendant has accepted responsibility for clear error. United States v. McCarthy, 32 F.4th 59, 62-63 (1st Cir. 2022). We will only reverse if we are "left with a definite and firm conviction that a mistake has been committed." Id. at 63 (quoting Brown v. Plata, 563 U.S. 493, 513 (2011)).

## 2.

The Commentary to the Guidelines for the acceptance-of-responsibility reduction under section 3E1.1 states, in relevant part:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 cmt. n.2. While "proceeding to trial creates a rebuttable presumption" against an acceptance-of-responsibility reduction, we have previously held that a defendant may still receive credit for acceptance of responsibility "in unusual circumstances." United States v. Gauthier, 53 F.4th 674, 677 (1st Cir. 2022) (first quoting United States v. Garrasteguy, 559 F.3d 34, 38-39 (1st Cir. 2009); and then quoting United States v. Hines, 196 F.3d 270, 274 (1st Cir. 1999)); see also United States v. Deppe, 509 F.3d 54, 60 (1st Cir. 2007) (finding credit for acceptance of responsibility after trial appropriate in "rare situations" (quoting U.S.S.G. § 3E1.1 cmt. n.2)).

Johnson asserts that his lengthy cooperation should have afforded him credit for acceptance. We are aware of Johnson's significant cooperation, having reviewed his grand jury testimony, cooperation agreement, confession to the New Hampshire state trooper, and agreements to work as a CS. We note also that during the trial, the DEA special agent testified that Johnson "definitely provided [the DEA] with active cooperation" and "real[-]time information" regarding drug transactions. But cooperation alone will not necessarily rebut the presumption that Johnson needs to overcome. As we have previously held, "cooperation does not guarantee . . . [a] downward adjustment." McCarthy, 32 F.4th at 66 (citing United States v. Nuñez-Rodriguez, 92 F.3d 14, 20 (1st Cir. 1996) (suggesting that voluntary cooperation may be considered in determining the "genuineness of the particular defendant's remorse" but will "not always prove a reliable . . . indicium of the defendant's remorse")).

At sentencing, the district court was mindful of the "nuanced" circumstances in Johnson's case, including his testimony before the grand jury and work as a CS. But, in declining to grant Johnson credit for acceptance of responsibility, the court also noted that Johnson disputed his factual guilt at trial and "continue[d] to contradict the jury's verdict" in his PSR objections. In detailing the section 3553(a) factors it considered relevant to the final sentence, the court also

emphasized that it found Johnson's allocution lacking in "humility" for his "role" in the offense. Rather than grant him a formal adjustment under section 3E1.1, the court considered Johnson's "episodic willingness and then unwillingness to cooperate" as a factor warranting a variant sentence below the Guidelines range. To that end, it framed the ultimate sentence as one that would give Johnson "some credit for at least gesturing toward something like acceptance." We consider this determination appropriate, as the court was in the best position to assess Johnson's acceptance through the course of the proceedings before it.

Finding no clear error in the district court's factual assessment, we affirm its denial of an acceptance-of-responsibility adjustment under section 3E1.1.

## III.

For the foregoing reasons, we <u>affirm</u> the verdict and sentence.